## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GERALD ALAN CASSEL, SR.. <br> 652 East Pickering Drive <br> Shelton, Washington 98584 <br><br> Plaintiff, <br><br> v. <br><br> XM SATELLITE RADIO HOLDINGS INC., <br> 1500 Eckington Pl., N.E., Washington, D.C. <br> 20002, and HUGH PANERO, 1500 Eckington <br> Pl., N.E., Washington, D.C. 20002 <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

Civil Action No.

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**JURY TRIAL REQUESTED**

Plaintiff, by his attorneys, brings this action on behalf of himself and all others similarly situated, and alleges the following upon personal knowledge as to his own activities, and based on investigation conducted by counsel for all other matters. That investigation has included the thorough review and analysis of public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission (the "SEC") filings, wire and press releases, and news articles concerning XM Satellite Radio Holdings Inc. ("XM " or "the Company"), securities analysts' reports and advisories about the Company, information readily available on the Internet, and other facts as set forth herein.

1

## NATURE OF THE ACTION

1.    This is a class action brought on behalf of a Class consisting of all persons who purchased the publicly traded securities of XM between July 28, 2005 and February 15, 2006, inclusive ("the Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").  These claims arise out of defendant's false and misleading statements and omissions concerning the cost of subscriber acquisition.

## JURISDICTION AND VENUE

2.    This action arises under Sections 10(b) and 20(a) of the Exchange Act, as amended, 15 U.S.C. §§ 78j(b), 78(n) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder.

3.    This Court has jurisdiction over this subject matter pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

4.    Venue is proper in this district pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b).  Defendant XM maintains it principal place of business within this district at all times relevant to this action, and many of the acts charged herein, including the dissemination of materially false and misleading information in connection with the sale of a security, occurred in this district.

5.    In connection with the acts alleged in this complaint, the Defendants, directly or indirectly, used means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone and Internet communications, and the facilities of the New York Stock Exchange.

**PARTIES**

6.     Plaintiff Gerald Alan Cassel, Sr. is located at 652 East Pickering Drive, Shelton, Washington 98584.  Plaintiff purchased shares of XM common stock during the Class Period, and was injured thereby, as demonstrated by Plaintiff's Certification, appended hereto.

7.     Defendant XM is a Delaware corporation with its executive offices and principal place of business in Washington D.C.; 1500 Eckington Place, N.E., Washington, District of Columbia, 20002.  XM touts itself as America's number one satellite radio company with more than 6.5 million subscribers and the most commercial-free programming.  XM broadcasts live daily from studios in Washington, DC, New York City, the Country Music Hall of Fame in Nashville, Toronto and Montreal.  XM's lineup includes more than 170 digital channels of choice from coast to coast.  XM, maintains that it is the leader in satellite-delivered entertainment and data services for the automobile market.  XM's industry-leading products are available at consumer electronics retailers nationwide.  XM has never reported a profit.  Thus, XM's value and, thus, the value of its stock, is based principally on the number of subscribers it reports and the costs of acquiring those subscribers.  In order to monitor its business growth and operational results, XM uses the key metrics of: "ending subscribers, Average Monthly Subscription Revenue Per Subscriber ("ARPU"), Subscriber Acquisition Costs ("SAC"), Costs Per Gross Addition ("CPGA") and EBIDTA", as stated in their Forms 10-Q filed with the SEC during the class period.  Accordingly, when XM releases its financial results to the public, it reports the specific dollar amount of SAC and CPGA, along with the number of ending subscribers, which the market uses as key factors to assess the value of XM and its stock price.  XM's has only one rival, SIRIUS, which touts itself as a "premium provider of nationwide satellite radio

3

entertainment." The two companies are in direct competition for new subscribers and new programming deals. The announced business decisions of one company affects the business decisions and success of the other company. Hence, the market looks at both of these competitors comparatively in valuing each of them. XM is actively followed by more than 25 securities analysts, including Bear Stearns, Merrill Lynch and JP Morgan

8.  Defendant Hugh Panero ("Panero") is the President and Chief Executive Officer of XM, and a director of XM, since 1998. Panero is the principal executive office of XM and signed the certifications required by the Section 302 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. Section 1350, attesting to the accuracy of the Forms 10-Q filed by XM with the SEC during the Class Period, including the specific certification that the SEC Form 10-K does not contain any false or misleading material fact or statement of fact. Panero also serves as the principal spokesperson for XM and is familiar with all aspects of its business, operations and finances.

## CLASS ACTION ALLEGATIONS

9.  Plaintiff brings this class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of a class of persons (or their successors in interest) who bought XM common stock between July 28, 2005 and February 15, 2006, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are the Defendants named herein, members of the immediate families of the Defendants, any firm, trust, partnership, corporation, officer, director or other individual or entity in which a Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, heirs, successors in interest or assigns of any such excluded party.

4

10.     The Class is so numerous that joinder of all members is impracticable. During the Class Period, XM had more than 221 million shares of common stock issued and outstanding, and such shares were publicly traded on the New York Stock Exchange ("NYSE"). The exact number of members of the Class is not known at this time, but is believed to number in the thousands.

11.     Plaintiff will fairly and adequately protect the interests of the members of the Class, and Plaintiff has no interests which are contrary to, or in conflict with, the interests of the Class members that he seeks to represent. Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to ensure such protection, and intends to prosecute this action vigorously.

12.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually seek redress for the wrongs done to them. There will be no difficulty in the management of this action as a class action.

13.     Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that Defendants have acted on grounds generally applicable to the entire Class. Among the questions of law and fact common to the Class are:

a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

b)      whether Defendants' publicly disseminated releases and statements during the Class Period omitted and/or misrepresented material facts and whether Defendants breached any duty to convey material facts or to correct material facts previously disseminated;

c)      whether Defendants participated in and pursued the common course of conduct complained of herein;

d)      whether Defendants acted with scienter in omitting and/or misrepresenting material facts;

e)      whether the price of XM securities was artificially inflated during the Class Period as a result of the material misrepresentations and omissions complained of herein;

f)      whether Panero was a control person as alleged herein; and

g)      whether members of the Class have sustained damages and, if so, the proper measure of such damages.

## SUBSTANTIVE ALLEGATIONS

### Defendant's Misrepresentations During The Class Period

14.      Throughout the Class Period, XM released a series of false and misleading statements, cited below, in support of their scheme, conspiracy and course of conduct.  Such statements misrepresented that XM would be able to reach its stated goal of acquiring 6 millions subscribers by the end of 2005, while reducing the costs of its new subscribers.  In reality and as known to, or recklessly disregarded by, defendants, XM would be required to spend enormous sums of money in the fourth quarter of 2005, in order to reach its goal of 6 million subscribers. The extraordinary monetary expenditures made by XM to acquire new subscribers were due to competitive factors which were known to defendants since before the beginning of the Class

Period. Although defendants knew that XM would need to spend these large sums of money in the fourth quarter of 2005, defendants failed to disclose to the public that the cost of subscriber acquisition would rise to excessive levels, leading to huge increases in XM's net losses, which was in direct contradiction of the goal and trend of declining subscriber acquisition costs and net losses that defendants were declaring during the Class Period.

15.    On July 28, 2005, XM announced its second quarter 2005 results with a press release stating that, "with XM's first half performance and even stronger outlook for the second half of the year, XM is increasing 2005 subscriber guidance from 5.5 million to 6 million ending subscribers." The Company also reported that second quarter revenues had increased 136% to $125 million, that the "significant revenue growth was driven by record second quarter net subscriber additions of 647,226" and that XM ended the "quarter with 4,417,490 subscribers." XM stated that its "net loss for the second quarter 2005 was ($146.6) million, as compared to ($166.1) million in the second quarter 2004" and that its "second quarter subscriber growth was strong" with its "second quarter 2005 Cost Per Gross Addition (CPGA) [at] $98, an improvement of $3, or 3 percent, from the $101 CPGA reported in the second quarter 2004."

16.    Shortly thereafter on July 29, 2005, Bernstein Research Call analysts, Craig Moffett and Amelia Wong, issued a report entitled "XMSR: Few Surprises But Strong Second Quarter Affirms Positive Long Term Trends." In this report, the analysts were pleased that XM's second quarter results provided "little in the way of surprises"and the "longer term profitability trend appeared to be playing out nicely." The report noted that "the operating cost story was a positive, with variable margins growing, and Subscriber Acquisition Costs (SAC) and Cost Per Gross Addition (CPGA) continuing to decline nicely despite a Buy One Get One free promotion during the quarter." In conclusion they stated, "[W]e find that XM is continuing to reduce its net loss as well as still accelerating subscriber net ads very encouraging. This indicates that costs are

continuing to fall (especially SAC and CPGA) even while XM sustains a very fast rate of growth." Thus, in their chart setting forth Bernstein's expectations for the third and fourth quarters of 2005 for SAC and CPGA, these analysts expected SAC $48 for Q3 2005 and $47 for Q4 2005 and for CPGA, $78 for Q3 2005 and $91 Q4 2005.

      17.    On August 5, 2005, defendants filed XM's SEC Form 10-Q for the second quarter of 2005 announcing that XM was:

> continuing to grow our gross margin (calculated as revenues less variable costs, which include revenue share & royalties, customer care & billing operations, cost of merchandise & ad sales) during the three months and six months ended June 30, 2005 while **reducing our costs to acquire each new subscriber**
>
> ***
>
> We will continue to incur operating losses until we substantially increase the number of our subscribers. We are focused on increasing subscribers and scaling our business while managing growth and **containing costs.**
>
> ***
>
> **We expect SAC to decline in 2005** as compared to 2004.
>
> ***
>
> **We expect CPGA to decline in 2005** as compared to 2004. (emphasis added)

      18.    On September 27, 2005, XM announced in a press release entitled,

"XM Satellite Radio Tops Five Million Subscribers," that:

> With more than five million subscribers today, XM continues to expand its position as the leader in the satellite radio industry ...We are on track to have more than six million subscribers by the end of this year. Consumers are choosing XM because we offer the most choices, including the most commercial-free music and live sporting events, and the most advanced technology. With the winning combination of outstanding new channels and breakthrough products in advance of the holiday season, XM is poised for **record growth during the fourth quarter.** (Emphasis added)

8

19.    On October 28, 2005, XM announced its third quarter results in a press release which reaffirmed its goal of "exceeding 6 million subscribers by the end of 2005." In the release, the Company reported that it had achieved "**Record Revenue from Cost-Effective Subscriber Growth.**" (Emphasis in the original). The press release stated that:

> XM ended the quarter with 5,034,642 subscribers, doubling the 2,516,023 subscribers reported last year for the third quarter. The growth was driven by third quarter net subscriber additions of 617,152, a 48 percent increase over the 415,671 net subscribers added in the third quarter 2004. Given its strong performance in the first three quarters, XM reaffirms its guidance of exceeding 6 million subscribers by the end of 2005.
>
> ***
>
> For the quarter, XM reported revenue of $153 million, an increase of 134 percent over the $65 million reported in the third quarter 2004. XM's third quarter subscriber growth was driven by strong automotive and retail distribution performance with a range of full-featured products. Subscriber Acquisition Costs (SAC) in the third quarter 2005 were $53, a decrease from the $57 in the third quarter 2004. Cost Per Gross Addition (CPGA) in the third quarters of both 2005 and 2004 was $89 ... XM expects to accelerate its subscriber and revenue growth through the fourth quarter.

20.    Following the third quarter earnings release, XM held a conference call at which defendant Panero spoke. Panero stated that the third quarter 2005 "exemplified what [he's] characterized as the smart subscriber growth the company has demonstrated quarter after quarter and year after year since [it] started service in November 2001.' Panero continued by saying that "the third quarter again demonstrated XM's ability to deliver dramatically increasing subscriber and revenue growth with the lowest subscriber acquisition costs, or SAC, in the industry." Moreover, Panero stated that:

the secret to XM's smart subscriber growth rather than growth at any costs is the ability to control marketing and product expenses while rapidly growing subscribers. This quarter XM kept its fully loaded per unit costs capturing a new subscriber, or CPGA, constant at $89 – the same CPGA that we reported in the third quarter last year. These results provide us with the flexibility to aggressively advertise and market our service in the fourth quarter. In fact, that is what we are doing implementing a comprehensive media campaign comprised of advertisements, rebates and other promotional techniques to fully exploit the holiday selling season again this year.

21.     During the conference call, Joe Euteneuer, Executive Vice President and Chief Financial Officer of XM discussed financial and operational metrics:

XM's SAC during the third quarter was a modest $53 per gross addition, a decline of $4 or 7%, from the $57 per gross addition in the third quarter of 2004. CPGA for the third quarter 2005 was $89 per gross addition, unchanged from the third quarter 2004 and down from $98 in the second quarter 2005. Similar to past trends, we expect fourth quarter SAC and CPGA to increase due to media and promotional activities during the upcoming holiday selling season.

22.     Subsequent to the third quarter earnings release and earnings conference call, Bernstein Research Call Analysts Craig Moffett and Amelia Wong issued a report dated October 20, 2005, in which they noted that XM reported solid 3Q results. In discussing costs, the Bernstein Research Call noted that "subscriber acquisition costs (SAC) and costs per gross additions (CPGA) were both slightly higher than we expected. Part of the difference appeared to be higher than expected negative equipment margins associated with the costs of their 'buy one get one free

promotion' that ran during 2Q and their $49.99 discount offer on the Rodie2Radio during 3Q. More radios being manufactured during the quarter to stock up retail channels in advance of the Christmas season could also have played a part; the Company commented that XM products were 'well stocked for the holiday season'." The report continued, "[M]anagement guided to higher SAC and CPGA in 4Q. XM continues to offer the Rodie2 at the $49.99 discounted price as its entry-level equipment offer, which can be expected to be popular with consumers. In addition, XM management stated on the earnings call that there will be more rebate offers and promotions to come for the holiday season. These strategies will keep the pressure on equipment margins and SAC in 4Q." These "aggressive marketing and advertising campaign planned for the holidays will mean higher advertising and marketing expenses, and therefore CPGA." As a result, Bernstein changed its estimates for fourth quarter for SAC to $61 and for CPGA to $110.

23. On November1, 2005, a third of the way through the fourth quarter, XM issued a press release, announcing that XM had increased its market share to 59% in the third quarter, from 56% in the second quarter. Defendant Panero touted in the press release that XM was able to accomplish the market share increase while decreasing costs: "**XM continues to expand its leadership position while adding subscribers at about one-third the cost of our competitor**." (Emphasis added).

24. On November 7, 2005, Defendants filed XM's SEC Form 10-Q for the third quarter of 2005. Defendants reported that XM was

continuing to grow our subscription margin
(calculated as Subscription revenue less variable
costs, which include Revenue share & royalties, and
Customer care & billing operations) during the three
months and nine months ended September 30, 2005
while reducing our Subscription acquisition costs)

\*\*\*

The timing of promotions and new contracts may
cause SAC to fluctuate from period to period.

\*\*\*

The timing of promotions and new contracts may
cause SAC to fluctuate from period to period.

    25.    At this time, defendants failed to disclose that one of its key directors,

Pierce J. Roberts, Jr., a former chief telecom investment banker with Bear Stearns

who had served as a director of XM for five years and sat on all of the board's major

committees, had become increasingly anxious over the direction of XM and had

become at odds within the Company, at both the Board and senior managerial levels,

about the fact that the current direction was not in the best interest of XM or its

shareholders.    Roberts was steadfast in his belief that XM needed to curb its

enormous marketing, programming and promotional spending.

    26.    Defendants foregoing statements were materially false and misleading

at the time they were made because: (1) In reality, the excessive cost of subscriber

acquisition would lead to huge increases in XM's net losses; (2) In reality, XM was

not continuing to grow its gross margin while reducing costs to acquire each new

subscriber; (3) In reality, XM was required to spend enormous sums of money in the

fourth quarter of 2005, in order to reach its goal of six million subscribers (Both SAC

and CPGA were growing, rather than decreasing during the Class Period, due to the

exorbitant cost of XM's aggressive marketing and advertising).

### The Truth Is Revealed

27.    On February 16, 2006, defendants issued a press release

announcing the fourth quarter 2005 and year 2005 results.  Defendants finally

disclosed startling truth about the soaring costs for XM subscriber acquisitions in

the fourth quarter of 2005:

> For the fourth quarter, subscriber acquisition cost
> (SAC), a component of cost per gross addition
> (CPGA) was $89 compared to $64 in the same period
> last year. CPGA in the fourth quarter was $141
> compared to $104 in the same period last year. These
> increases were primarily due to higher marketing
> expenses to meet a one-time competitive event in the
> fourth quarter.

As previously anticipated by former director Roberts in his strenuous

objections to XM's soaring costs, XM's SAC increased to 39% and the CPGA

increased to 36%.  Despite defendants knowledge of the astronomical costs, as

they were being planned for and incurred and as former director Roberts was

vigorously opposing them, defendants never once made a full disclosure to the

market of these material facts.  Instead, defendants mislead the market with their

announcements of "efficient" subscriber acquisition costs and declining

acquisition costs throughout 2005.

28.    The market responded adversely to defendants' overdue disclosures.  On

February 15, 2005, XM's common stock price closed at $25.25.  After the disclosures on

February 16, 2006, XM's common stock, with an abnormally heavy trading volume, fell

13% to close at $21.96 on February 17, 2006.

29.    Defendants made yet another shocking disclosure on February 16, 2006

when XM filed an SEC Form 8-K disclosing that Director Pierce J. Roberts, Jr., had

submitted a letter of resignation to the Chairman of the Board of Directors of XM.  In his

February 13, 2006 letter of resignation, Roberts noted that:

> I have been troubled about the direction of the company and
> do not believe that it is in the best interest of the company's
> shareholders. For some time I have made my analyses and
> observations known in an increasingly vociferous manner to
> the Board and a number of senior managers of Company. I am
> not having any useful effect and I care too much and believe
> in my own view too much to just 'go along'.

> Given current course and speed there is, in my view, a
> significant chance of a crisis on the horizon. Even absent a
> crisis, I believe that XM will inevitably serve its shareholders
> poorly without major changes.

30.    Defendants attempted to explain Roberts' resignation with the following

statement in XM's Form 8-K regarding the views the Roberts had long made known to

defendants:

> On Monday, February 13, 2006, XM Satellite Radio Holdings
> Inc. Board Chairman Gary Parsons received a letter of
> resignation via email from XM Director Pierce J. Roberts, Jr.
> All other Board members were copied on the letter of
> resignation. The Company believes, and the resignation letter
> notes, that Director Roberts resigned based on his
> disagreements with the Company and other Board members
> regarding certain aspects of the Company's operational
> direction.

***

Although the letter does not explicitly state the nature of the disagreement, the Company believes the disagreement with Director Roberts primarily involves the strategic balance of growth versus cash flow. Director Roberts has historically favored more stringent cost control in the Company, specifically involving lower marketing, programming and promotional expenditures. While Director Roberts believed that expenses could be lowered without jeopardizing subscriber and revenue growth and/or market share, he was prepared to risk growth or market share impacts if they resulted, with the belief that positive cash generation would occur sooner, and the Company's stock would be valued more highly as a smaller, but more profitable enterprise.

The Company and other Directors concur in Mr. Roberts' assessment that lower programming and marketing expenditures, and a potentially lower growth rate, would likely result in earlier positive cash generation.

## CAUSATION ALLEGATIONS

31.    XM common stock was publicly traded in an efficient market at all relevant times. As described *supra*, Defendants' material misrepresentations and omissions had the effect of creating and maintaining an artificially inflated price for XM securities. Those misrepresentations and omissions served to maintain or raise the share price at artificially inflated levels by concealing the skyrocketing costs of subscriber acquisition that XM faces as a result of the actions detailed herein, and thus, by overstating XM's financial position during the Class Period. These statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as detailed herein.

32.    Defendants had a duty to promptly disseminate accurate and truthful information with respect to XM's financial and operational condition, or to cause and

direct that such information be disseminated, as well as to promptly correct any previously disseminated information that was misleading to the market. As a result of their failure to do so, the material misstatements and omissions created in the market an unrealistically positive assessment of XM, thus causing the price of XM's common stock to be artificially inflated and overvalued during the Class Period. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus leading to their losses when the truth was revealed and admitted by defendants, and the market was able to accurately value the Company, damaging Plaintiff and the Class.

33.    It was not until Defendants' disclosures on February 16, 2006 that Plaintiff was unaware of all of the facts, as described herein, and could not have reasonably discovered the Defendants' fraudulent scheme by the exercise of reasonable diligence.

34.    Defendants' false and misleading statements and omissions in their press releases and other public statements directly caused losses to the Class. On the strength of these false statements, misrepresentations and material omissions in its press releases, announcements and other public statements concerning its financial condition, the Company's stock was artificially inflated to a Class Period high of $37.31 and remained artificially inflated until the end of the Class Period.

35.    The truth concealed by the fraudulent activity detailed herein was revealed on February 16, 2006, when the truth about XM was revealed. XM's stock has, to date, declined $6.84, or 28.5%, as a result of this revelation.

36.    The timing and magnitude of the decline in the value of XM's stock price negates any inference that the loss suffered by Plaintiff and the Class was the result of factors unrelated to Defendant's fraudulent conduct.  Plaintiff and members of the Class purchased or otherwise acquired XM common stock relying upon the integrity of the market price of the Company's common stock, and have been damaged thereby. Throughout XM's decline, the Standard & Poor's 500 securities index has been essentially flat.

## DEFENDANTS ACTED WITH SCIENTER

37.    Each misrepresentation and/or omission of material fact alleged herein was made with reckless disregard for, or knowledge of its falsity and misleading nature. At all relevant times, each Defendant knew that they were planning to spend, and were spending, huge sums in the fourth quarter of 2005 which would cause XM's SAC and CPGA to increase dramatically and in stark contrast to the decline in SAC and CPGA that XM had reported in earlier quarters and continued to tout would continue to decline throughout the rest of 2005.  Defendants knew or should have known that their public statements in press releases and SEC filings were materially false and misleading as alleged above.  Defendants also knew or recklessly disregarded the liability XM faces as a result of the actions detailed herein, knew or recklessly disregarded that XM's costs were grossly understated during the Class Period, knew that such statements or documents would be issued or disseminated to the investing public, and knowingly or substantially participated or acquiesced in the issuance or dissemination of such statements or

17

documents as primary violations of the federal securities laws. Thus, the misrepresentations detailed herein were made with Defendant's knowledge, or with deliberate recklessness.

38.    Indeed, the actions detailed herein could not have been done without scienter. As described above, spending the exorbitant amounts on acquiring subscribers was approved by Defendants – an act of which Defendants were plainly aware. Similarly, Defendants were plainly aware of the representations made in their SEC filings.

39.    In the February 16, 2006 conference call, Defendant Panero admitted that the huge increase in SAC and CPGA numbers in the fourth quarter of 2005 were the results of the campaign XM waged in the fourth quarter to compete with the arrival of Howard Stern at SIRIUS radio at the beginning of 2006, primarily on increased media spending.

40.    A November 14, 2005 article in *The Wall Street Journal On Line*, commented that XM spent $25 million on a new ad campaign to distract from the Howard Stern's presence at SIRIUS.

41.    Several key insiders of XM made huge sales of their personal holdings of XM stock in the fourth quarter of 2005, before any disclosure of the astronomical increases in XM's SAC and CPGA was made, and therefore taking advantage fo the artificially inflated stock price:

a)    Defendant Panero sold 413,334 of his shares, 99% of his total XM holdings, on December 6, 2005 at prices ranging between $28.37 and $28.95 with a profit of $11, 846,000.

18

b)      Stelios Patsiokas, XM Executive Vice President, sold 103, 514 shares, amounting to 62% of his XM holdings, on December 6, 2005 at prices ranging between $28.55 and $28.95 with a profit of $2,976,000.

c)      Joseph M. Titlebaum, XM Executive Vice President, General Counsel and Secretary, sold 103,514 shares, 66% of his XM holdings, on December 6, 2005 at $28.4356 with a profit of $2,943,482.

d)      Stephen Cook, XM Executive Vice President Sales and Marketing, sold 78,514 shares, amounting to 43% of his XM holdings, on December 6, 2005 at prices ranging between $28.37 and $28.95 with a profit of $2,238,000; and

e)      Director George Weaver Haywood made three sales on November 8, 9, 10, 2005 for a total of 2,071,000 shares, amounting to over 72% of his XM holdings, at prices ranging between $27.85 and $29.61 for a profit of $58,943,000.  None of these insiders sold any XM stock in the comparable year earlier time period.

## FRAUD ON THE MARKET ALLEGATIONS

42.     At all relevant times, the market for XM securities was an efficient market for the following reasons, among others:

a.      At all relevant times during the Class Period, XM's common stock was listed and actively traded either over the counter or on the NYSE, a highly efficient National Market, with over 258.36 million shares issued and outstanding as of March 31, 2006.

19

a)      As a registered and regulated issuer of securities, XM filed periodic

reports with the SEC, in addition to the frequent voluntary dissemination of information

described in this Complaint.

b)      XM was followed by more than 25 securities analysts employed by major

brokerage firms who wrote reports which were distributed to the sales force and certain

customers of their respective brokerage firms.  Each of these reports was publicly

available and entered the public marketplace.

c)      As a result of the above, the market for XM securities promptly digested

current information with respect to the Company from all publicly available sources and

reflected such information in the securities' prices.  Under these circumstances, all

purchasers of XM securities during the Class Period suffered similar injury through their

purchase of securities at prices which were artificially inflated by Defendants'

misrepresentations and omissions.  Thus, a presumption of reliance applies.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

B)      The statutory safe harbor for certain forward-looking statements does not

apply to the misrepresentations and omissions alleged in this complaint.  Many of the

statements were not specifically identified as "forward-looking statements" when made.

To the extent that there were any properly identified forward-looking statements, there

were no meaningful cautionary statements identifying the important then-present factors

that could and did cause actual results to differ materially from those in the purportedly

forward-looking statements.  Alternatively, to the extent that the statutory safe harbor

does apply to any forward-looking statement pleaded herein, Defendants are liable

nonetheless because at the time each of the misrepresentations was made, the particular speaker(s) knew that the statement was false or misleading at that time.

43.    Any warnings or other cautionary language contained in the press releases and other public statements described herein were generic, "boilerplate" statements of risk that would affect any similar company, and misleadingly contained no factual disclosure of any of the problems with the Company which placed the ability of the Company to accurately depict its own financial situation into serious question. As such, any forward-looking statements complained of herein were not accompanied by meaningful cautionary language.

44.    Any relevant purported risk disclosures were, in fact, false and misleading in and of themselves, by virtue of the fact that the events which the risk disclosures purported to warn against as contingencies had frequently already become a reality or a certainty.

## COUNT I

### (Violations of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated
### Thereunder Against All Defendants)

45.    Plaintiff incorporates by reference and realleges all preceding paragraphs as though fully set forth herein.

46.    During the Class Period, Defendants engaged in a plan, scheme and course of business which operated as a fraud upon Plaintiff and Class Members, and made various untrue statements of material fact and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they

were made, not misleading to Plaintiff and other Class Members as set forth above. The purpose and effect of this scheme was to induce Plaintiff and the members of the Class to purchase the Company's securities during the Class Period at artificially inflated prices.

47.    By reason of the foregoing, Defendants knowingly or recklessly violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they themselves or a person whom they controlled: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and other members of the Class in connection with their purchases of the Company's common stock during the Class Period.

48.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the false and misleading nature of the representations described above, Plaintiff and other members of the Class relied, to their detriment, directly on the misstatements or the integrity of the market both as to price and as to whether to purchase these securities. Plaintiff and the other members of the Class would not have purchased XM stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' false and misleading statements and omissions. At the time of the purchase of XM securities by Plaintiff and the other members of the Class, the fair

market value of said securities was substantially less than the prices paid. Plaintiff and the other members of the Class have suffered substantial damages as a result.

## COUNT II

### (Violations of § 20(a) of the Exchange Act Against The Individual Defendants)

49.     Plaintiff incorporates by reference and realleges all preceding paragraphs as though fully set forth herein.

50.     Panero is liable for the material misrepresentations and omissions complained of herein under §20(a) of the Exchange Act in that they functioned as a control person of XM by virtue of their executive and directorial positions with XM, his knowledge of and involvement in the business of the Company, their daily access to confidential information regarding the operations and finances of the Company, and his power and ability to make public statements on behalf of XM to shareholders, potential investors and the media. As such, he had the power and ability to control the Company's actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and on behalf of the Class, pray for judgment as follows:

1.     Declaring this action to be a class action pursuant to Rules 23(a) and 23 (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

2.      Awarding Plaintiff and members of the Class rescissory or compensatory damages in an amount which may be proven at trial, together with interest thereon;

3.      Awarding Plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees and expert witness fees and other costs; and

4.      Awarding such other and further relief as this Court may deem just and proper including any extraordinary equitable relief and/or injunctive relief as permitted by law or equity to attach, impound or otherwise restrict the Defendants' assets to assure Plaintiff and the members of the Class have an effective remedy.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.


DATED:        May 16, 2006


Respectfully submitted,


Donald J. Enright (D.C. Bar #463007)
FINKELSTEIN, THOMPSON
& LOUGHRAN
1050 30th Street, NW
Washington, D.C. 20007
Telephone: (202) 337-8000
Facsimile: (202) 337-8090

24